UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CANANDAIGUA EMERGENCY SQUAD, INC., THE
PENFIELD VOLUNTEER EMERGENCY
AMBULANCE SERVICE, INC., NORTHEAST
QUADRANT ADVANCED LIFE SUPPORT, INC.,
CHILI VOLUNTEER AMBULANCE SERVICE, INC.,
VILLAGE OF MACEDON,

                     Plaintiffs,

                                                                      DECISION AND ORDER

                                                                      09-CV-6027L

                     v.

ROCHESTER AREA HEALTH MAINTENANCE
ORGANIZATION, INC. d/b/a PREFERRED CARE
and MVP HEALTH CARE, INC.,

                     Defendants.
_____

**INTRODUCTION**

Plaintiffs in this action are four not-for-profit corporations, and one municipal corporation, that operate emergency ambulance services. Plaintiffs commenced this action in New York State Supreme Court, Monroe County, in January 2009, alleging that they have provided emergency ambulance services to defendants Rochester Area Health Maintenance Organization, Inc. d/b/a Preferred Care ("Preferred Care"), and MVP Health Care, Inc., and that defendants have wrongfully withheld a portion of certain payments that are due to plaintiffs for those ambulance services.

Plaintiffs seek to recover the amount of those withheld payments, as well as an order declaring that defendants have no right to withhold any part of the monies that are due to plaintiffs.

The complaint sets forth ten causes of action, most of which are based on state or common law. One cause of action, the tenth, is on its face based on federal statutory law, and alleges that "[t]o the extent that any of the amounts paid by Preferred Care to Plaintiffs represent overpayments, Plaintiffs were each 'without fault' in receiving the overpayments," and that therefore, under the federal Medicare statutes, specifically 42 U.S.C. § 1395gg(b)(1)(B), § 1395cc "or other applicable sections" of Title 42, plaintiffs are not obligated to repay those amounts to Preferred Care. Complaint (Dkt. #1-3) ¶ 88.

Defendants removed the action to this Court shortly after it was filed, on the basis of federal question jurisdiction. The notice of removal states that this Court has original jurisdiction under 28 U.S.C. § 1331 over plaintiffs' claims under §§ 1395gg and 1395cc, apparently based on the complaint's reference to the federal statutes referred to above. Defendants also note that the complaint cites a number of federal Medicare regulations, and that plaintiffs have alleged that defendants denied them due process of law. *See*, *e.g.*, Complaint ¶¶ 10, 31, 81.

Defendants have moved for summary judgment dismissing the complaint. Plaintiffs have moved for summary judgment on the issue of liability, and for leave to amend the complaint.

Subsequent to oral argument on the motions, the Court, by way of letter to both counsel, raised the question of whether the Court has subject matter jurisdiction over plaintiffs' claims, for reasons that will be explained in detail below. *See* Dkt. #77. In their responses, counsel for both sides have taken the position that federal question jurisdiction exists, on the ground that the

resolution of plaintiffs' claims requires an interpretation of the federal Medicare statutes and regulations. *See* Dkt. #73, #74.

Despite the parties' agreement that subject matter jurisdiction exists, the Court cannot simply accept that assertion unquestioningly. It is well established that parties cannot stipulate or consent to subject matter jurisdiction where it otherwise would not exist. *See*, *e.g.*, *Ahmed v. Holder*, 624 F.3d 150, 154 (2d Cir. 2010) ("we may not exercise jurisdiction that we otherwise lack simply because the parties will allow it"); *United States v. Ceja-Prado*, 333 F.3d 1046, 1049 (9th Cir. 2003) ("We have repeatedly recognized that federal jurisdiction cannot be created by the parties ... in cases in which jurisdiction otherwise does not exist"); *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 883 (7th Cir. 1998) ("It is a basic principle ... that the parties cannot stipulate to the subject-matter jurisdiction of the federal courts"). In addition, regardless of whether the parties agree that subject matter jurisdiction exists, federal courts have an ongoing duty to ensure that subject matter jurisdiction exists over the matters before them. *See Dean v. Blumenthal*, 577 F.3d 60, 64 (2d Cir. 2009) ("we address our subject-matter jurisdiction over this appeal, which we have an independent obligation to evaluate even in the absence of a challenge from any party"), *cert. denied*, 130 S.Ct. 2347 (2010); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 121 (2d Cir. 2007) (noting court's "independent obligation to satisfy ourselves of the jurisdiction of this court and the court below").

After considering the matter, I conclude that this Court lacks subject matter jurisdiction over the parties' claims, and that this action must therefore be dismissed. *See Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 295 (2d Cir. 2000) ("because a challenge to subject matter

jurisdiction cannot be waived, and because where jurisdiction is lacking, dismissal is mandatory," court was obligated to consider whether requirements for subject matter jurisdiction existed), *dismissed on remand*, 207 F.Supp.2d 71 (W.D.N.Y. 2002).

## FACTUAL BACKGROUND

The events giving rise to this case involve certain dealings between plaintiffs and Preferred Care. Although Preferred Care has now been succeeded by MVP Health Plan, Inc., which is a subsidiary of defendant MVP Health Care, Inc., most of the relevant events took place at a time when Preferred Care was still operating under that name, and so for the sake of convenience the Court will generally refer simply to "Preferred Care" as the operative party.

Preferred Care is a health maintenance organization ("HMO") that is also a "Medicare Advantage organization" ("MAO"), meaning that it administers a Medicare Advantage insurance program pursuant to Medicare Part C. As summarized by the Second Circuit,

> Medicare, the federal government's health insurance plan for the elderly and certain persons with disabilities, automatically provides coverage to qualifying individuals for inpatient treatment and related services under Medicare Part A. Medicare Part B, which covers visits to doctors and certain other outpatient treatment, is "a voluntary program offering supplemental insurance coverage for those persons already enrolled in the Medicare 'Part A' program." ... Medicare Part C ... allows a managed care organization to enter into a "risk contract" to provide an enrollee a full range of Medicare services in exchange for monthly payments that the organization receives from the government.

*Matthews v. Leavitt*, 452 F.3d 145, 147 n.1 (2d Cir. 2006) (quoting *Furlong v. Shalala*, 238 F.3d 227, 229 (2d Cir. 2001)) (other citations omitted).

Part C, then, the current version of which was enacted by Congress in 1997, and amended in 2003, "provides beneficiaries with an option to ... obtain the benefits available under Parts A and B as well as some additional benefits through a health insurance plan, known as a 'Medicare Advantage Plan,' administered by a private company." *Dial v. Healthspring of Alabama, Inc.*, 541 F.3d 1044, 1046 (11th Cir. 2008). *See also First Medical Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 47 (1st Cir. 2007) (explaining that "[u]nder Part C, beneficiaries can, *inter alia*, enroll in 'Medicare Advantage' plans, privately-run managed care plans that provide coverage for both inpatient and outpatient services"). The stated purpose of Part C was to "allow beneficiaries to have access to a wide array of private health plan choices in addition to traditional fee-for-service Medicare ... [and to] enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H. Conf. Rep. No. 105-217, at 585 (1997), *reprinted in* 1997 U.S.C.C.A.N. 176, 205-06.

Some Preferred Care members are also Medicare Advantage enrollees. Preferred Care receives payments to cover the cost of services rendered to those enrollees from the Centers for Medicare and Medicaid Services ("CMS"), which administers the Medicare program. Those payments are not based on the actual services provided, but are paid on a per-enrollee basis. In other words, Preferred Care receives the same payments from CMS, based on the number of Preferred Care enrollees who are Medicare Part C enrollees, regardless of what services are actually rendered to those members/enrollees. Preferred Care then uses those funds to reimburse health care providers, such as ambulance services, hospitals, physicians, etc., for services rendered to the members in question. *See Hofler v. Aetna US Healthcare of California, Inc.*, 296 F.3d 764, 766 (9th Cir. 2002),

*abrogated on other grounds by Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005); *Minnesota Senior Fed'n, Metro. Region v. United States*, 273 F.3d 805, 807 (8th Cir. 2001), *cert. denied*, 536 U.S. 939 (2002); *NME Hospitals, Inc. v. Bowen*, Civ. A. No. 87-1450, 1987 WL 12000, at *1 (D.D.C. May 29, 1987).

Since at least 2006, each of the plaintiffs has provided emergency ambulance services to Preferred Care members. None of the plaintiffs have had a written contract with Preferred Care. Typically, one of plaintiffs' ambulances would be dispatched following a 911 call, and if the person receiving the ambulance service was a Preferred Care member, the plaintiff would then submit a bill to Preferred Care, which would remit payment to the plaintiff. According to the complaint, Preferred Care would not necessarily pay the full amount of the bill, but would pay "a reasonable amount," which plaintiffs would accept without objection. Complaint ¶ 84.

That arrangement apparently worked well until November 2008, when Preferred Care mailed an "Explanation of Benefits" to each plaintiff's billing company. That letter stated that Preferred Care had discovered that it had "overpaid" plaintiffs for certain ambulance services rendered to Medicare Advantage enrollees during 2007 and 2008. The notice further stated that Preferred Care intended to recoup those overpayments by means of setoffs against Preferred Care's payments to plaintiffs for future services rendered by plaintiffs.

The reason why Preferred Care believed that it had overpaid plaintiffs lies in a new fee schedule for ambulance service providers that began to be implemented by CMS in 2002. That fee schedule, which was fully operational by January 1, 2006, set forth nationwide, standardized

reimbursement rates for entities providing ambulance services to Medicare beneficiaries, and replaced the previous system, which had been based on a standard of "reasonable" charges and costs.

It is not clear if the parties were immediately aware of that change, but even after it was implemented, plaintiffs continued to bill Preferred Care as they had before, for amounts in excess of the Medicare fee schedule. Up until some point in 2008, Preferred Care also continued to pay those invoices, in "reasonable" amounts that were greater than the Medicare fee schedule amounts.[1]

Defendants state that in April 2008, Preferred Care discovered that the computer software that it used for processing Medicare claims was still accepting bills for amounts greater than the Medicare fee schedule. The discovery of what defendants describe as a "software problem," which had caused Preferred Care to "inadvertently overpa[y]" plaintiffs during 2007 and part of 2008, is what led to the November 2008 notice to plaintiffs informing them that Preferred Care was going to "recoup" those overpayments "on a month to month ... going forward basis." Decl. of Matthew MacKinnon (Dkt. #39) ¶¶ 10, 11. According to plaintiffs, all of those disputed amounts have since been recovered by Preferred Care. Dkt. #73 at 1. The disputed amounts run generally into tens of thousands of dollars as to each plaintiff.

Plaintiffs assert ten causes of action. The first five assert conversion claims by each of the five plaintiffs. The sixth cause of action simply alleges that "Preferred Care has no authority and/or legal right to recoup the allegedly overpaid fees from Plaintiffs." Complaint ¶ 76.

---

[1] The complaint alleges that Preferred Care would typically pay less than the amount claimed in the bill, but more than the Medicare fee schedule amount. There is no indication that plaintiffs ever objected to the amounts paid by Preferred Care. Complaint ¶¶ 17, 84.

The seventh cause of action asserts a claim of unjust enrichment. The eighth alleges that "Preferred Care denied Plaintiffs due process of law" by not giving plaintiffs an opportunity to dispute the amounts owed. Complaint ¶ 81.

The ninth claim alleges that plaintiffs had a "non-written agreement with Preferred Care to pay a reasonable fee, over and above the Medicare Ambulance Fee Schedule," and that Preferred Care has breached that agreement. Complaint ¶ 83. In their motion to amend, plaintiffs seek to replead this cause of action as an "account stated" claim.

The tenth cause of action asserts that to the extent that any of the amounts paid by Preferred Care to plaintiffs could be considered overpayments, plaintiffs were without fault in receiving the overpayments. Plaintiffs allege that pursuant to the Medicare statutes concerning payments to Medicare providers, they are therefore not required to repay the amounts in dispute.

Plaintiffs seek a declaration from this Court that Preferred Care is not entitled to offset or recoup any funds from plaintiffs for ambulance services supplied to enrollees of Preferred Care prior to 2009, and an order directing Preferred Care to remit in full the amounts offset from payments to plaintiffs in connection with the disputed "overpayments."

Defendants have asserted two counterclaims against plaintiffs. They allege that Preferred Care "mistakenly overpaid plaintiffs" from January 1, 2007 through 2008, in amounts totaling roughly $19,000 to $148,000 per defendant over that period. Dkt. #13 ¶¶ 42-50. Defendants assert claims for restitution and money had and received, and seek judgment against each plaintiff in the amount of the alleged overpayments.[2]

---

[2]Although it appears that Preferred Care has now recouped all of the amounts in dispute,
(continued...)

**DISCUSSION**

As stated, the one cause of action in the complaint that on its face purports to be based on federal law cites two statutes, 42 U.S.C. §§ 1395gg(b)(1)(B) and 1395cc. Neither of those statutes has any relevance to this case, however. The former deals with the *government's* right to recoup Medicare overpayments to providers, which is not at issue in the case at bar. *See Florida Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1280 (11th Cir. 2010); *MacKenzie Medical Supply, Inc. v. Leavitt*, 506 F.3d 341, 349 (4th Cir. 2007). The other section, § 1395cc, provides that to be eligible to receive payments under Medicare, a provider of services must file with the government a Medicare provider agreement requiring compliance with all Medicare regulations, including an agreement not to charge individuals for non-covered services. Again, that simply has no bearing upon the facts giving rise to this action, which involves a dispute between private, nongovernmental entities. If this case presents a federal question, then, it must arise out of some other provision or aspect of federal law.

In their moving papers, both sides rely on several other federal statutory and regulatory provisions. For purposes of this discussion, an extensive recitation of those provisions is not necessary, though some familiarity with them is useful. In short, defendants contend that federal law imposes a strict cap on the amount that may be paid to an ambulance service provider by an MAO, as set forth in the fee schedule, and that if more than that amount is paid, the excess must be returned

---

[2](...continued)
at the time that defendants filed their counterclaims, a portion of those moneys was still (from defendants' perspective) due and owing to Preferred Care. What defendants now seek, then, is essentially a declaration that Preferred Care was, and remains, entitled to those funds.

to the MAO. Plaintiffs take the position that no such cap exists, and that an MAO is free to pay a noncontract provider more than the fee schedule amount, if the MAO chooses to do so.

At first blush, then, this case might well appear to arise under federal law. That conclusion, however, does not withstand closer scrutiny.

"The determination of whether a claim 'arises under' federal law–or, as in the present case, whether removal jurisdiction existed–is 'determined by reference to the "well-pleaded complaint."'" *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 100 (2d Cir.) (quoting *Merrell Dow Pharms. v. Thompson*, 478 U.S. 804, 808 (2001)), *cert. denied*, 534 U.S. 1066 (2001). "[F]ederal jurisdiction must be found from 'what necessarily appears in the plaintiff's statement of his own claim ..., unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose.'" *W. 14th St. Commercial Corp. v. 5 W. 14th Owners Corp.*, 815 F.2d 188, 192 (2d Cir. 1987) (quoting *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914)). After "[e]xamining only those allegations which are properly raised in a well-pleaded complaint, the court must then determine whether the substance of those allegations raises a federal question." *Id.* Under this rule, then, the mere invocation of a federal statute is not enough; the question is whether "a federal question is presented on the face of the plaintiff's properly pleaded complaint." *California v. United States*, 215 F.3d 1005, 1014 (9th Cir. 2000).

The Supreme Court has interpreted "the statutes in Title 28 that define the scope of federal subject-matter jurisdiction ... to mean that a claim arises under federal law if federal law provides a necessary element of the plaintiff's claim for relief." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 376 (2004) (footnote omitted). In the Medicare context, the Court has stated that a claim arises

under the Medicare Act when "both the standing and the substantive basis for the presentation" of the claim is the Medicare Act, or if the claim is "inextricably intertwined" with a claim for Medicare benefits. *Heckler v. Ringer*, 466 U.S. 602, 615, 623 (1984).

In applying these principles here, it is first necessary to define what plaintiffs' claims are, *i.e.*, what gave rise to this dispute, what relief plaintiffs seek, and on what basis they do so. While much of the parties' attention has been focused on the prior payments to plaintiffs by Preferred Care, those payments, in themselves, did not directly precipitate this action. Rather, it was Preferred Care's later act of withholding a portion of its payments to plaintiffs for subsequent services, in order to recoup what Preferred Care asserted were prior overpayments, that led to this lawsuit.

Plaintiffs allege that Preferred Care had no right to apply any offsets to those later payments, under federal or state law, but plaintiffs' right, if any, to recover those offsets ultimately springs from state law. As stated, the two federal statutes cited in the complaint do not, on the facts alleged here, present a genuine federal question, since they have no application to the facts alleged. The complaint's vague reference to "other applicable sections" of Title 42 is likewise insufficient to give state a facially plausible federal claim, *see Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009), and plaintiffs have not pointed to any federal statute creating a right of action by a service provider to recover disputed amounts in circumstances like these.

That Preferred Care may have asserted, in justification of its actions, that it was entitled to apply the offsets because its prior payments were excessive under federal law, does not present a federal question with respect to plaintiffs' claims in this lawsuit. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("a case may not be removed on the basis of a federal defense ... even if

the defense is anticipated in the plaintiff's complaint and both parties concede that the federal defense is the only question truly at issue "). Furthermore, the dispute over those payments and offsets implicates neither the interests of any Medicare enrollees, nor of the government, which are the focus of the Medicare Act and its implementing regulations.

These points are well illustrated by a case from the Fifth Circuit, *RenCare, Ltd. v. Humana Health Plan of Texas, Inc.*, 395 F.3d 555 (5th Cir. 2004). In *RenCare*, the defendant Humana, an HMO, contracted with RenCare to provide kidney dialysis services to Humana's enrollees, including its enrollees under Medicare Part C (known at the time as Medicare+Choice or "M+C"). After Humana and RenCare became embroiled in a dispute over reimbursement, RenCare sued Humana in state court for breach of contract, detrimental reliance, fraud, and violations of state law.

Humana removed the action to federal district court, arguing that RenCare's claims were preempted by the Medicare Act. On RenCare's motion to remand, the district court retained jurisdiction over RenCare's claims as they related to M+C enrollees, and remanded to state court RenCare's claims relating to Humana's commercial enrollees. Subsequently, the district court dismissed the claims that remained in federal court, finding that RenCare had failed to exhaust its administrative remedies under the Medicare Act.

On appeal, the Fifth Circuit reversed. In explaining why "RenCare's claims f[e]ll outside of the category of cases that arise under the Medicare Act," *id.* at 558, the court noted, first, that "Medicare beneficiaries were not denied services or reimbursement for services," that "Humana's M+C enrollees [we]re not at risk of being billed for the services that RenCare provided them," and that "there [we]re no enrollees seeking Medicare benefits." *Id.* Furthermore, the court added, "the

government has no financial interest in the present case because it pays Humana a flat rate each month for Humana's services to M+C enrollees, regardless of the services it renders to M+C beneficiaries. Irrespective of who ultimately prevails, the government will not receive or pay out funds." *Id.* "With the government's risk extinguished," the court stated, "any dispute over payment to RenCare is solely between RenCare and Humana." *Id.* at 559.

The same reasoning applies to the case at bar. The dispute here is between a group of private ambulance service providers and Preferred Care. Neither the government nor any Medicare enrollees are parties to this action, nor do they have any particular interest in the outcome of this case.. No enrollees have been denied benefits, or are in danger of being denied benefits, and no government funds are at risk. *Cf. Matthews v. Leavitt*, 452 F.3d 145 (2d Cir. 2006) (reviewing government's decision, which was made pursuant to administrative review procedures applicable in 1998, upholding decision by Medicare+Choice plan discontinuing recipient's benefits); *Kaye v. Humana Ins. Co.*, No. 08-80819-CIV, 2009 WL 455438, at *8 (S.D.Fla. Feb. 23, 2009) (Medicare+Choice participant's breach of contract claim, in which he challenged insurance company's determination denying his claim for benefits under his health insurance policy, was "'essentially' a claim for benefits and therefore preempted by federal Medicare law").

In response to the Court's post-argument letter concerning subject matter jurisdiction, counsel for both sides took the position that this case is distinguishable from *RenCare* because the HMO and the service provider in *RenCare* had a contract, whereas in the case at bar, plaintiffs did not have written contracts with Preferred Care, and thus are noncontract providers. In my view, that is a distinction without a difference.

Regardless of whether the parties were operating under a formal written contract, an oral one, or a mutual understanding as to fees, the dispute here is solely between them; neither the government nor the recipients of the ambulance services have any interest in the outcome. No Medicare recipient has been, or could be, denied ambulance services as a result of the outcome of this case, and no government funds are at stake. That the parties had no written contract is simply immaterial.

In *Christus Health Gulf Coast v. Aetna, Inc.*, 237 S.W.3d 338, 344-45 (Tex. 2007), the Supreme Court of Texas, agreeing with the Fifth Circuit's reasoning in *RenCare*, held that the lower state court had jurisdiction to hear the plaintiff hospitals' claims under state law against an MAO. In so doing, the court stated that it was not "dispositive that there apparently was no contract directly between Aetna [the MAO] and the Hospitals," since the "prohibition on enrollee liability [*i.e.*, Part C enrollees' liability to service providers] extends to providers who contract directly with the Medicare Advantage organization as well as those that do not," and that "[a]s in *RenCare*, therefore, enrollees are protected from liability for fees that the Medicare Advantage organization must pay, and the only interest at issue here is the Hospitals' interest in receiving payment from the Medicare Advantage organization." Thus, the absence of a formal contract here has no bearing on the interests at stake.

The complaint also cites 42 U.S.C. § 422.100(a), which provides that "[a]n MA organization must make timely and reasonable payment to or on behalf of the plan enrollee for [emergency ambulance] services obtained from a provider or supplier that does not contract with the MA organization to provide services covered by the MA plan ... ." *See* Complaint ¶ 31. Plaintiffs argue that this, too, distinguishes the instant case from *RenCare*. The court in *RenCare* noted that

"contracts between M+C organizations and providers are subject to very few restrictions," and that "generally, the parties may negotiate their own terms." 395 F.3d at 559. Plaintiffs contend that, in contrast, § 422.100(a) requires that MAOs make "reasonable" payments to noncontract providers, which arguably limits MAOs' freedom to set payment rates to such providers, compared to contract providers, whose rates are set by contract.

That argument might have some surface appeal, were it not for the fact that there is no mandatory administrative review process for a claim alleging a violation of § 422.100. If, as both parties contend, plaintiffs' claims truly arise under federal law, then they must arise under the Medicare Act and its implementing regulations. Claims arising under the Medicare Act, however, are subject to an exhaustion-of-remedies requirement. Plaintiffs have not sought any administrative review of Preferred Care's actions here, and both sides agree that no avenues for such review existed at the time of the events in question. The absence of an administrative appeals process with respect to plaintiffs' claims is further evidence that the claims do not arise under the Medicare Act.[3]

---

[3]In response to the Court's post-argument letter, the parties here agreed that there is now a dispute resolution process in place for noncontract providers, pursuant to which a noncontract provider that embroiled in a payment dispute with an MAO can request an independent decision from an independent entity that has contracted with CMS to act as CMS's Payment Dispute Resolution Contractor. Disputes subject to this process "include any decisions where a non-contracted ... provider contends that the amount paid by the organization for a covered service is less than the amount that would have been paid under original Medicare." MA Payment Guide for Out of Network Payments, 2/25/2010 Update, at 22-23 (available at http://www.cms.gov/MedicareAdvtgSpecRateStats/Downloads/oon-payments.pdf). This process, however, went into effect in 2010, and was not available prior to the time that plaintiffs filed this lawsuit. In any event, it does not appear from the language of the MA Payment Guide that the process is mandatory or that it is intended to be a precondition to filing suit in federal court.

It is well established that "§ 405(g) [of Title 28] is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." *Fox Ins. Co v. Sebelius*, 381 Fed.Appx. 93, 97 (2d Cir. 2010) (quoting *Heckler*, 466 U.S. at 616). *See also Giesse v. Secretary of Dep't of Health and Human Services*, 522 F.3d 697, 703-04 (6th Cir. 2008) ("The Medicare Act's grant of subject matter jurisdiction only permits judicial review of 'the final decision of [the Secretary] made after a hearing.' Thus, judicial review of claims arising under the Medicare Act is available only after the Secretary renders a 'final decision' on the enrollee's claim") (quoting 42 U.S.C. § 405(g), and citing *Heckler*, 466 U.S. at 605). Before bringing suit pursuant to 42 U.S.C. § 405(g), however, a plaintiff must first exhaust administrative remedies. *Shalala v. Illinois. Council on Long Term Care, Inc.*, 529 U.S. 1, 20 (2000); *Heckler*, 466 U.S. at 627; *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975).

Section 405(g), by its terms, applies to actions by "[a]ny individual [affected by] any final decision of the Commissioner of Social Security ... ." On its face, then, it does not apply to claims by a provider seeking payment from an MAO, which is precisely the point. The Medicare Act does not contemplate judicial actions that do not involve an enrollee's claim for benefits, and where no government funds are at stake.

Some Medicare provisions permit an enrollee to seek administrative review of an MAO's decisions, as opposed to a CMS decision, but again, those provisions do not contemplate claims by a service provider. In general, "[t]he administrative procedures utilized in addressing an enrollee's claim against a M+C organization depends on whether the enrollee's challenge is classified as a 'grievance' or as an appeal from an 'agency determination.'" An "agency determination," sometimes also referred to as an "organization determination," involves a determination by an MAO with

respect to payment for health care services, while "[a] grievance 'is any complaint or dispute, other than one that constitutes an organizational determination, expressing dissatisfaction with any aspect of an [M+C] organization's or provider's operations, activities, or behavior, regardless of whether remedial action is requested.'" *Giesse*, 522 F.3d at 704 (quoting 42 C.F.R. § 422.561). Federal regulations provide for administrative review of agency determinations, after which the aggrieved party may seek judicial review, whereas "[g]rievances ... do not have additional levels of review beyond the M+C organization."

"Any provider that furnishes, or intends to furnish, services to the enrollee" can request an organization determination, 42 C.F.R. § 422.566(c)(1)(ii), but such determinations are those that focus on "the benefits an enrollee is entitled to receive under an MA plan ... ." 42 C.F.R. § 422.566(a). These provisions, in other words, are aimed at providing an avenue of relief for Medicare *enrollees* who are seeking additional benefits. Claims by providers against MAOs are simply not envisioned by the statutory or regulatory framework.. *See Preemption of Contract Claims by the Medicare Act: An Analysis of the Recent Holding in Lifecare Hospitals v. Ochsner Health Plan*, 24 Rev. Litig. 125, 146 (2005) (opining that a decision by an HMO not to pay a health care provider is not an "organization determination" within the meaning of the Medicare regulations).

Again, the Fifth Circuit's decision in *RenCare* is instructive. The court there held that not only did the plaintiff RenCare's claims not arise under the Medicare Act, but that "RenCare's claims [we]re excluded from the M+C administrative appeals process," because "[t]he administrative review process attendant to Part C does not extend to claims in which an enrollee has absolutely no interest." 395 F.3d at 559. The court went on to state that

- 17 -

> [a]s is evident from the regulations, the administrative review process focuses on enrollees, not health care providers, and is designed to protect enrollees' rights to Medicare benefits. Here, Humana's failure to pay RenCare is not an organization determination subject to the mandatory exhaustion of administrative remedies. No enrollee has requested an organization determination or appeal. No enrollee has been denied covered service or been required to pay for a service. Rather, the M+C enrollees in this case bear no financial risk inasmuch as they have already received the services for which RenCare seeks reimbursement. In fact, there is a complete absence of M+C beneficiary interest in this dispute. The only interest at issue is RenCare's interest in receiving payment under its contract with Humana.

*Id.* at 559-60.

Three years after *RenCare*, the Supreme Court of Texas reached a similar result in *Christus Health*, *supra*, the facts of which the court described as "strikingly similar" to those in *RenCare*. 237 S.W.3d at 342. With respect to the Fifth Circuit's holding that the plaintiff's claims in *RenCare* did not arise under the Medicare Act, the Texas court stated that "[w]hile the Fifth Circuit's holding on this point is persuasive, it is unclear whether *Heckler*'s 'arising under' test even applies to Medicare Advantage claims," *id.* at 343, since under Medicare Advantage a fourth party–the MAO–is added to the traditional Medicare dispute between the enrollee, the government, and the service provider. *See id.* (citing *Preemption of Contract Claims*, *supra*, 24 Rev. Litig. at 127).

The court in *Christus Health* went on to state, "We need not decide that question today, however, as we agree with the *RenCare* court's second conclusion: 'it appears that the administrative review process attendant to Part C does not extend to claims in which an enrollee has absolutely no interest.'" *Id.* (quoting *RenCare*, 395 F.3d at 559). As in *RenCare*, the court stated, the parties' dispute in *Christus Health* "concern[ed] not whether the services were covered under Medicare, but rather who should bear the loss associated with [the plan administrator]'s failure to pay," *i.e.*, the plaintiff hospitals or the HMO, Aetna. *Id.* at 343. The court noted that "the only

interest at issue here is the Hospitals' interest in receiving payment from the Medicare Advantage organization," and that "[w]hether those fees are in fact Aetna's legal obligation [under state law wa]s a matter within the trial court's jurisdiction." *Id.* at 345. *See also RenCare, Ltd. v. United Med. Resources*, 180 S.W.3d 160, 169 (Tex. App. San Antonio 2005) (agreeing with reasoning of Fifth Circuit's *RenCare* decision, and holding that plaintiff RenCare's fraud and misrepresentation claims against plan administrator did not arise under Medicare Act, since "[a]t bottom, RenCare's claims [we]re claims for payment pursuant to a contract between private parties").[4]

I also note that plaintiffs' eighth cause of action alleges that "Preferred Care denied Plaintiffs due process of law by recouping and offsetting fees without a hearing or the opportunity to first submit proof or dispute the amount owed." Dkt. #1-3 ¶ 81. To the extent that this purports to assert a federal due process claim, it fails, since Preferred Care is not a state actor, and there are no facts alleged suggesting that Preferred Care's actions could be considered to be "fairly attributable" to the state. *See Desiderio v. NASD*, 191 F.3d 198, 206-07 (2d Cir. 1999) (stating that a "threshold requirement of plaintiff's constitutional claims is a demonstration that in denying plaintiff's

---

[4]While there are a handful of cases suggesting that claims by providers against MAOs might arise under the Medicare Act, several of those cases are from the Fifth Circuit, and predate the Court of Appeals' decision in *RenCare*. It is therefore questionable whether those cases are still good law in the wake of *RenCare*. In addition, those cases do not support a finding of jurisdiction here, because they also stand for the proposition that, if a case does arise under the Medicare Act, that act's exhaustion requirement must be satisfied before such claims may be brought in federal court. *See, e.g., Foley v. Southwest Texas HMO, Inc.*, 226 F.Supp.2d 886, 903-07 (E.D.Tex. 2002); *Lifecare Hospitals, Inc. v. Ochsner Health Plan, Inc.*, 139 F.Supp.2d 768, 771-73 (W.D.La. 2001); *In re Heritage Southwest Med. Group, P.A.*, 309 B.R. 916, 919-22 (Bankr. N.D.Tex. 2004) (relying on *Foley* and *Lifecare*, prior to Fifth Circuit's decision in *RenCare*); *RenCare, Ltd. v. Humana Health Plan of Texas, Inc.*, No. SA-02-CA-1157, slip op. at 5-7 (W.D.Tex. Mar. 25, 2003) (citing and agreeing with *Foley* and *Lifecare*), *rev'd*, 395 F.3d 555 (5th Cir. 2004).

constitutional rights, the defendant's conduct constituted state action," and finding that defendant's acts were not attributable to the state on the facts alleged). *See also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982) (stating that the Due Process Clause "can be violated only by conduct that may be fairly characterized as 'state action'").

I conclude, therefore, that none of plaintiffs' claims arise under the Medicare Act, and that none of them presents a federal question. Accordingly, this Court lacks subject matter jurisdiction over plaintiffs' claims, and the complaint must therefore be remanded to state court.

## CONCLUSION

This action is hereby ordered to be remanded to New York State Supreme Court, Monroe County.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
January 6, 2011.